JOSEPH W. COTCHETT (SBN 36324)
jcotchett@cpmlegal.com
SARVENAZ J. FAHIMI (SBN 226148)
sfahimi@cpmlegal.com
PIERCE H. STANLEY (SBN 352152)
pstanley@cpmlegal.com
VASTI S. MONTIEL (SBN 346409)
vmontiel@cpmlegal.com
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

*Attorneys for Plaintiff and the Proposed Classes*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

**DEBORAH BRUCKER**, individually and on behalf of all others similarly situated,

Plaintiff,

v.

**LEVI STRAUSS & CO.**

Defendant.

Case No.:

**CLASS ACTION COMPLAINT**

**(1) Unjust Enrichment / Quasi-Contract**

**(2) Money Had and Received**

**(3) Violation of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.***

**(4) Fraudulent Misrepresentation, Cal. Civ. Code §§ 1709, 1710**

**<u>JURY TRIAL DEMANDED</u>**

# TABLE OF CONTENTS


Page

**I. INTRODUCTION** ..... 1

A. The IEEPA Tariffs ..... 2

B. Levi Told Investors It Would Recoup the Tariffs Through "Surgical" Price Increases ..... 2

C. Levi Raised Its Prices and Credited the Increases with Offsetting Tariffs ..... 2

D. The Supreme Court Declared the IEEPA Tariffs Unlawful ..... 3

E. Levi Has Applied for an $80 Million Refund and Has Not Committed to Return Any of It ..... 4

F. The Result Is Unjust Enrichment ..... 4

**II. PARTIES** ..... 5

A. Plaintiff ..... 5

B. Defendant ..... 5

**III. JURISDICTION AND VENUE** ..... 6

**IV. FACTUAL ALLEGATIONS** ..... 6

A. Levi's Business and the IEEPA Tariffs ..... 6

B. Levi Announced a "Surgical" Tariff Pricing Strategy at the Outset ..... 8

C. Levi's Executives Repeatedly Tied Levi's Price Increases to the Tariffs ..... 8

D. Levi's Tariff Price Increases Boosted Its Margins Without Costing It Sales ..... 9

E. Levi Confirmed Its Tiered Pricing Strategy and Extended Its Price Increases Into 2026 ..... 10

F. Levi's Price Increases on Specific Products ..... 11

G. The Supreme Court Held the IEEPA Tariffs Are Unlawful ................ 11

H. The Government Returns the Tariffs to Importers, Not Consumers ................ 12

I. Levi Has Applied for an $80 Million Refund: "We Haven't Figured Out What to Do With It." ................ 12

J. Levi's Own Disclosures Frame the Consumer Overcharge ................ 14

K. Equitable Relief Is Necessary to Prevent Levi from Retaining the Consumer-Funded Refund ................ 14

**V. CLASS ACTION ALLEGATIONS** ................ 15

**VI. CLAIMS FOR RELIEF** ................ 17

**FIRST CLAIM FOR RELIEF**
Unjust Enrichment / Restitution (Quasi-Contract) (On Behalf of Plaintiff, the Nationwide Class, and the California Subclass) ................ 17

**SECOND CLAIM FOR RELIEF**
Money Had and Received (On Behalf of Plaintiff, the Nationwide Class, and the California Subclass) ................ 17

**THIRD CLAIM FOR RELIEF**
Violation of the Unfair Competition Law Cal. Bus. & Prof. Code §§ 17200, *et seq.* (On Behalf of Plaintiff, the Nationwide Class, and the California Subclass) ................ 18

**FOURTH CLAIM FOR RELIEF**
Fraudulent Misrepresentation Cal. Civ. Code §§ 1709, 1710 (On Behalf of Plaintiff, the Nationwide Class, and the California Subclass) ................ 20

**VII. PRAYER FOR RELIEF** ................ 20

**VIII. DEMAND FOR JURY TRIAL** ................ 22

Plaintiff Deborah Brucker, individually and on behalf of all others similarly situated, upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, hereby alleges as follows:

## I. <u>INTRODUCTION</u>

1. This case is about a company that told Wall Street, quarter after quarter, that it was raising prices to offset import tariffs, extracted those price increases from American consumers, and now stands to collect the very same proceeds a second time, approximately **$80 million plus interest**, from the United States government after the Supreme Court declared the tariffs unlawful.

2. Asked what the company intends to do with that refund, Levi's Chief Executive Officer ("CEO") Michelle Gass ("Gass") answered,

**"We haven't figured out what to do with it."**

Not one dollar has been returned to the consumers who paid the tariff-driven price increases.

3. Plaintiff Deborah Brucker ("Plaintiff" or "Ms. Brucker"), individually and on behalf of those similarly situated, brings this class action against Defendant Levi Strauss & Co. ("Levi" or the "Company") to recover monies that Levi extracted from American consumers as an offset for import tariffs that the United States Supreme Court has since declared unlawful, tariffs for which Levi has now applied to be reimbursed, with interest, by the federal government, and which Levi has reserved for its own use rather than returning them to consumers who funded the tariff payments in the first place.




***Levi Strauss & Co.'s Headquarters in San Francisco, California***

### A. The IEEPA Tariffs

4. In early 2025, President Trump invoked the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701, *et seq*. ("IEEPA"), to impose sweeping tariffs on imports from China and nearly every other United States trading partner. Levi, whose jeans, tops, jackets, and other apparel are ubiquitous and are manufactured mostly overseas in countries including Bangladesh, Pakistan, Cambodia, and Vietnam, was subject to those duties. Levi responded by raising the prices American consumers pay for its products.

### B. Levi Told Investors It Would Recoup the Tariffs Through "Surgical" Price Increases

5. On April 7, 2025, within days of the administration's broadest IEEPA tariff proclamation, *The Wall Street Journal* reported that Levi's CEO Michelle Gass said the company would be "surgical" with any price hikes on its iconic jeans rather than making across-the-board changes in response to the tariffs.[1]

6. Levi then did exactly that. Over the following year, Levi's executives told investors, analysts, and the financial press that Levi was taking "targeted pricing action" to "offset the impact of tariffs,"[2] that its pricing actions were part of its "tariff mitigation," and that it was "leveraging that pricing power" on higher-tier products while taking "more modest pricing" on entry-level items.[3]

### C. Levi Raised Its Prices and Credited the Increases with Offsetting Tariffs

7. Levi's price increases reached the products American consumers buy. In February 2026, *The Wall Street Journal* reported that Levi had raised prices in January 2026 in response to tariffs and was rolling out additional price increases that month. Among the products identified were

---

[1] *Levi Strauss CEO Says Tariff Price Hikes Will Be 'Surgical'*, Wall St. J. (Apr. 7, 2025), https://www.wsj.com/livecoverage/stock-market-trump-tariffs-trade-war-04-07-25/card/levi-strauss-sees-minimal-impact-from-tariffs-this-quarter-Ov7Vvpj06PyAMot76ied.

[2] Levi Strauss & Co., Q3 2025 Earnings Call Tr. (Oct. 9, 2025) (remarks of Harmit Singh, Chief Financial Officer and Chief Growth Officer), https://stockanalysis.com/stocks/levi/transcripts/362847-q3-2025/.

[3] Levi Strauss & Co., Q4 2025 Earnings Call Tr. (Jan. 28, 2026) (remarks of Harmit Singh and Michelle Gass), https://stockanalysis.com/stocks/levi/transcripts/390785-q4-2025/.

Levi's Ribcage Straight Ankle women's jeans, up $10 to $108, and its original-fit men's jeans, up $5 to $84.50.[4] Levi made no announcement of the increases to consumers.

8. Levi's executives, meanwhile, confirmed to investors that the price increases were doing their job. On Levi's fourth quarter fiscal 2025 earnings call, Levi's Chief Financial Officer ("CFO"), Harmit Singh ("Singh"), attributed Levi's gross margin contraction "primarily" to "the impacts of tariffs, which were partially offset by pricing actions and higher full-price selling."[5] As CEO Gass put it: "**There's only so much you can absorb from the tariffs, because they're just very high**."[6]

### D. The Supreme Court Declared the IEEPA Tariffs Unlawful

9. On February 20, 2026, the Supreme Court held in *Learning Resources, Inc. v. Trump*, 146 S. Ct. 628 (2026), that IEEPA does not authorize the President to impose tariffs. The tariffs that Levi invoked to justify its price increases were therefore unlawful from the moment they were imposed.

10. Following that decision, the United States Court of International Trade ("CIT") ordered U.S. Customs and Border Protection ("CBP") to refund the unlawfully collected IEEPA duties, with interest.

11. CBP implemented a mass refund mechanism, the Consolidated Administration and Processing of Entries ("CAPE") system, which began accepting refund declarations on April 20, 2026. Under federal customs law, those refunds flow exclusively to importers of record such as Levi, not to the consumers who actually bore the tariffs' economic burden through Levi's price increases.

---

[4] Ruth Simon, *The Break Is Over. Companies Are Jacking Up Prices Again.*, Wall St. J. (Feb. 15, 2026), https://www.wsj.com/business/price-increases-consumers-businesses-b70e4542.

[5] Q4 2025 Earnings Call Tr., *supra* note 3.

[6] Nick Lichtenberg, *'There's only so much you can absorb from the tariffs, because they're just very high': Levi's CEO states the plain truth*, Yahoo! Finance (Nov. 24, 2025) (reporting on Business of Fashion interview of Michelle Gass), https://finance.yahoo.com/news/only-much-absorb-tariffs-because-194156554.html.

**E. Levi Has Applied for an $80 Million Refund and Has Not Committed to Return Any of It**

12. Levi has disclosed in its filings with the Securities and Exchange Commission ("SEC") that it paid approximately $80 million in IEEPA tariffs.[7] Levi's CFO has told the press that Levi expects to receive approximately $80 million in refunds.[8]

13. On July 8, 2026, an analyst asked Levi's management what the Company intended to do with the refund. Management confirmed that Levi had "just started applying" for the refunds, described the amount as "substantial," and stated, "**We haven't figured out what to do with it, because that'll depend on the environment and a whole bunch of things.**"[9]

14. On October 7, 2026**,** Levi reported in an earnings release receipt of $79 million in tariff refunds and $5 million in interest income from tariffs and described redeploying those refund benefits into the business.[10]

15. Levi has been refunded, but consumers have received nothing. Levi has not refunded, credited, or otherwise returned to its customers any portion of the tariff-justified price increases it collected, has not committed to do so, and has made clear that the disposition of the refund proceeds will turn on Levi's own business considerations rather than on who actually paid the tariffs.

**F. The Result Is Unjust Enrichment**

16. The result is classic unjust enrichment. Levi charged its customers for the cost it attributed to the tariffs. The tariffs were unlawful. The government is returning that cost with

---

[7] Levi Strauss & Co., Quarterly Report (Form 10-Q) for the quarterly period ended Mar. 1, 2026, at 18 (filed Apr. 7, 2026) (the "Q1 2026 Form 10-Q"), https://www.sec.gov/Archives/edgar/data/94845/000009484526000020/lvis-20260301.htm.

[8] Dan Mangan et al., *Trump says 'I'll remember' companies that don't seek tariff refunds*, CNBC (Apr. 21, 2026), https://www.cnbc.com/2026/04/21/trump-says-hell-remember-companies-that-dont-seek-tariff-refund.html.

[9] Levi Strauss & Co., Q2 Fiscal 2026 Earnings Call Tr. (July 8, 2026), https://stockanalysis.com/stocks/levi/transcripts/642826-q2-2026/.

[10] Levi Strauss & Co., Press Release, *Levi Strauss & Co. Reports Third-Quarter Results* (Oct. 7, 2026), https://investors.levistrauss.com/news/financial-news/news-details/2026/Levi-Strauss--Co--Reports-Third-Quarter-Results/default.aspx.

interest. Levi stands to be made whole twice for a single unlawful exaction, once by its customers and once by the Treasury, and it has reserved the second recovery for itself.

17. Other participants in the same supply chain have done the opposite. Shippers and customs brokers including FedEx and UPS, which acted as importers of record and received tariff refunds from the government, have begun publicly passing those refunds through to the customers who originally paid the duties.[11] What separates Levi from those companies is that Levi has not committed to returning anything to its customers.

18. Plaintiff brings this action on behalf of a Nationwide Class and a California Subclass of purchasers of Levi products during the period of the unlawful tariffs, seeking restitution, disgorgement, the imposition of a constructive trust over Levi's IEEPA tariff refunds and their traceable proceeds to the extent of the amounts passed through to consumers, as well as declaratory judgment, public injunctive relief, and all other available relief.

## II. PARTIES

### A. Plaintiff

19. Plaintiff Deborah Brucker is a citizen of California, residing in Santa Ana, California. Ms. Brucker is a loyal Levi's customer, having purchased Levi's products for over the last forty years. On or about October 11, 2025, Plaintiff purchased a pair of Levi's Men's 501® Regular Fit Straight Leg Jeans for $60.80. The price Plaintiff paid reflected Levi's tariff-justified price increase. Had Levi not inflated its prices in the name of the unlawful IEEPA tariffs, Plaintiff would have paid less for the same product. Plaintiff has received no refund, credit, or other compensation from Levi corresponding to the tariff component of the price Plaintiff paid.

### B. Defendant

20. Defendant Levi Strauss & Co. is a Delaware corporation with its global corporate headquarters and principal place of business at 1155 Battery Street, San Francisco, California 94111. Levi designs, markets, and sells jeans, casual and dress pants, tops, shorts, skirts, jackets, footwear,

[11] Mae Anderson, *A surprise credit after an overseas purchase: The tariff refunds now flowing through shippers*, Associated Press (Aug. 14, 2026), https://apnews.com/article/tariff-refund-shipping-retail-d4162f466eb83aa97e430a86221ad226.

and related accessories, which it sells throughout the United States through its own branded retail stores, through third-party retailers, and online.

21. On information and belief, Levi Strauss & Co. is the importer of record for Levi products sold in the United States, and it is the entity that remitted the IEEPA duties at issue to CBP.

## III. JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a putative class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than 100 putative class members; and minimal diversity exists because at least one member of the putative Nationwide Class is a citizen of a state different from Defendant. Defendant is a citizen of Delaware, where it is incorporated, and of California, where it maintains its principal place of business. Members of the Nationwide Class are citizens of all fifty states.

23. This Court has personal jurisdiction over Defendant. Levi maintains its global corporate headquarters and principal United States operations in this District, and the pricing decisions, public statements, and conduct alleged herein emanated from this District.

24. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant resides in this District and a substantial part of the events giving rise to Plaintiff's claims, including the decision to impose and maintain the tariff-justified price increases, the statements to investors and the press regarding those increases, the application for IEEPA tariff refunds, the decisions regarding the disposition of those refunds, and the operation of the Levi.com storefront, occurred in this District.

25. Pursuant to Civil Local Rule 3-2(c) and (d), assignment to the San Francisco Division or the Oakland Division is proper because a substantial part of the events giving rise to the claims occurred in the City and County of San Francisco, where Levi is headquartered.

## IV. FACTUAL ALLEGATIONS

### A. Levi's Business and the IEEPA Tariffs

26. Levi has designed and sold apparel, including jeans, shirts, shorts, jackets, and related goods, since the 1850s, and it is among the most widely recognized clothing brands in the

United States. Levi sells its products through its own branded stores, through third-party retailers nationwide, and online.

27. Levi's products are manufactured overseas and imported into the United States for sale to American consumers. Levi has disclosed that "[m]any of our products are produced in countries, such as Bangladesh, Cambodia, Pakistan, and Vietnam, that were subject to the recently invalidated U.S. IEEPA tariffs."[12] On information and belief, Levi does not manufacture the products at issue in the United States.[13]

28. On February 1, 2025, President Trump invoked IEEPA to impose tariffs of 25 percent on imports from Canada and Mexico and 10 percent on imports from China, citing fentanyl trafficking. Those duties took effect on February 4, 2025. According to the *Wall Street Journal*, tariffs for Mexico and Canada were delayed until March 4, 2025, but IEEPA tariffs on imports from China started as soon as President Trump announced them in February.[14]

29. On April 2, 2025, the administration invoked IEEPA again to impose a baseline 10 percent tariff on imports from nearly all United States trading partners, with substantially higher country-specific rates layered on top.

30. In total, CBP collected approximately $166 billion in IEEPA duties from more than 330,000 importers across more than 53 million entries.

31. The IEEPA tariffs applied to the countries in which Levi's products are manufactured. Every unit of merchandise Levi imported into the United States from those countries during the tariff period was subject to duties the Supreme Court has since invalidated. Levi has

---

[12] Levi Strauss & Co., Quarterly Report (Form 10-Q) for the quarterly period ended May 31, 2026 (the "Q2 2026 Form 10-Q"), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000094845/000009484526000037/lvis-20260531.htm.

[13] Q1 2026 Form 10-Q, *supra* note 7, at 27.

[14] Gavin Bade, Santiago Pérez, and Vipal Monga, *Trump's Canada-Mexico Tariffs Take Effect*, Wall St. J. (Mar. 4, 2025), https://www.wsj.com/economy/trade/trump-tariffs-canada-mexico-china-trade-4e610130.

confirmed that, through the first quarter of its 2026 fiscal year, it paid approximately $80 million in IEEPA duties.[15]

32. As a major importer whose products are manufactured overseas, Levi could not avoid the tariffs' effect on its cost of goods sold. Levi chose to manage that cost pressure not by absorbing it, but by raising the prices of its products and passing the tariffs through to its customers.

### B. Levi Announced a "Surgical" Tariff Pricing Strategy at the Outset

33. Levi planned its pricing response to the tariffs from the moment they took effect. On April 7, 2025, within days of the April 2 IEEPA proclamation, *The Wall Street Journal* reported that CEO Gass said the company would be "surgical" with any price hikes on its iconic jeans rather than making across-the-board changes in response to the tariffs.[16]

34. Levi's choice of words previewed the strategy it went on to implement and describe to investors for the next year: selective, product-by-product price increases calibrated to recoup tariff costs while avoiding the kind of across-the-board increase that consumers would be likely to notice.

### C. Levi's Executives Repeatedly Tied Levi's Price Increases to the Tariffs

35. At the Goldman Sachs Global Retailing Conference on September 3, 2025, Levi's CFO and Chief Growth Officer, Singh, was asked directly how the tariffs would affect Levi's pricing. He answered by quantifying the tariffs and connecting them to Levi's pricing decisions:

> "[A]s we said in our quarter two earnings a couple of months ago, our assumption at that time was that the impact of tariffs would be an additional 10% on product imported into the US from the rest of the world and about 30% from China. Given the latest round of reciprocal tariffs, that's probably a little higher. . . . We've taken a little bit of pricing in the second half. . . . The way I think about the brand is, I think we provide great price value to our consumers, and as long as we can do that, even in a higher tariff environment, even if after taking prices up a little, I think we'll be able to continue to grow market share."[17]

---

[15] Q1 2026 Form 10-Q, *supra* note 7, at 18.

[16] *Levi Strauss CEO Says Tariff Price Hikes Will Be 'Surgical'*, *supra* note 1.

[17] Goldman Sachs 32nd Annual Global Retailing Conference Tr. (Sept. 3, 2025) (remarks of Harmit Singh, Chief Financial Officer and Chief Growth Officer), https://stockanalysis.com/stocks/levi/transcripts/380802-goldman-sachs-32nd-annual-global-retailing-conference-2025/.

36. On Levi's third quarter fiscal 2025 earnings call on October 9, 2025, Singh told investors that Levi was "continuing to take actions to offset the impact of tariffs," identifying "promotion optimization, targeted pricing action, vendor negotiation, and further supply chain diversification" among its tools.[18]

37. The same day, Gass told CNBC that Levi's pricing actions had not cost the Company sales, and that Levi was watching that tradeoff closely, stating, "As we've been taking these targeted actions, we've not seen an impact to demand. We'll of course, stay very, very close to that but . . . we're taking a surgical, thoughtful approach on any pricing."[19]

38. In a November 24, 2025 interview with *The Business of Fashion*, Gass described the tariff environment as "very complex" and was direct about the limits of what Levi was willing to absorb: **"There's only so much you can absorb from the tariffs, because they're just very high."**[20]

39. Levi thus presented the tariffs and its price increases to investors as offsetting entries in the same ledger. The price increases were not a response to demand, competition, or product improvement. By Levi's own description, they were "tariff mitigation."

### D. Levi's Tariff Price Increases Boosted Its Margins Without Costing It Sales

40. Levi's pricing actions helped it beat Wall Street's expectations. CNBC reported that Levi's gross margin for the third quarter of fiscal 2025 rose 1.1 percentage points to 61.7 percent, above the 60.7 percent analysts had projected, and credited the improvement to targeted price increases and a shift away from wholesalers. CNBC further reported, citing Gass, that the Company **"has started to raise the price of some of its jeans and clothes and will hike more in the U.S. and other markets next year."**[21]

---

[18] Q3 2025 Earnings Call Tr., *supra* note 2.
[19] Gabrielle Fonrouge, *Levi Strauss raises prices, helping to boost profit and outlook*, CNBC (Oct. 9, 2025), https://www.cnbc.com/2025/10/09/levi-strauss-levi-q3-2025-earnings.html.
[20] Lichtenberg, *supra* note 6.
[21] Fonrouge, *supra* note 19.

41. Gass's repeated assurance to investors that Levi had "not seen an impact to demand" confirms where the tariff cost landed. Consumers continued to buy Levi products at the higher prices, and Levi recouped the tariffs from them.

**E. Levi Confirmed Its Tiered Pricing Strategy and Extended Its Price Increases Into 2026**

42. On Levi's fourth quarter fiscal 2025 earnings call, held January 28, 2026, Singh told investors that gross margin had contracted 100 basis points year-over-year, "primarily due to the impacts of tariffs, which were partially offset by pricing actions and higher full-price selling."[22] On the same call, Gass described precisely how Levi decided which prices to raise and by how much:

> "So yeah, as we, as we talked about earlier, we are taking, call it, thoughtful, targeted pricing actions, as part of our tariff mitigation. . . . So you know, where it's appropriate, especially in our higher, you know, higher tiered and newness innovation, we're leveraging that pricing power, while at the same time taking more modest pricing and being very diligent on, call it, those tier three, lower priced entry-level prices."[23]

43. Levi's price increases continued into 2026. In mid-February 2026, *The Wall Street Journal* reported that Levi, among other companies, was raising prices early in the year on items including blue jeans, and that Levi had raised prices the prior month in response to tariffs and was rolling out additional price increases that month.

44. *The Wall Street Journal* further reported that Levi said it had more opportunity to raise prices on newer and higher-end products and was increasing prices by more modest amounts on lower-priced, entry-level items, the same tiered strategy Gass had described to investors.[24]

45. On Levi's first quarter fiscal 2026 earnings call in April 2026, Singh again confirmed that the decline in gross margin "was partially offset by pricing actions and lower promotional

---

[22] Q4 2025 Earnings Call Tr., *supra* note 3.
[23] *Id.*
[24] Simon, *supra* note 4.

activity," and that Levi had "not seen an impact on demand" from the price increases it had imposed.[25]

46. Levi's own statements, from its April 2025 description of a "surgical" pricing strategy through its confirmation a year later that demand had not suffered, establish that the tariffs raised Levi's costs and that Levi responded, quarter after quarter, by raising the prices its customers paid.

47. Nowhere in any consumer-facing communication did Levi tell its United States customers that it had raised the retail prices they pay, that the increases were attributable to tariffs, or that it would retain any refund of those tariffs. Levi reserved those admissions for its investors.

**F. Levi's Price Increases on Specific Products**

48. On February 15, 2026, *The Wall Street Journal* reported price increases from tariffs prices for two Levi products Ribcage Straight Ankle Women's Jeans and 501® Original Fit Men's Jeans.[26] On information and belief, these increases range from approximately 6 to 12 percent. Consistent with the tiered strategy Levi described to investors, the largest increases fell on Levi's higher-priced styles, which rose by approximately 10 to 12 percent, while lower-priced styles rose by approximately 6 to 7 percent.

**G. The Supreme Court Held the IEEPA Tariffs Are Unlawful**

49. On February 20, 2026, the Supreme Court held in *Learning Resources, Inc. v. Trump*, 146 S. Ct. 628 (2026), that IEEPA does not authorize the imposition of tariffs, resolving the consolidated challenges that had proceeded through the CIT and the Federal Circuit.

50. The IEEPA tariffs were accordingly unlawful from inception. As the CIT subsequently held, all importers of record whose entries were subject to IEEPA duties are entitled to the benefit of the Supreme Court's decision.[27]

---

[25] Levi Strauss & Co., Q1 2026 Earnings Call Tr. (Apr. 7, 2026) (remarks of Harmit Singh), https://stockanalysis.com/stocks/levi/transcripts/547935-q1-2026/.

[26] Simon, *supra* note 4.

[27] *Atmus Filtration, Inc. v. United States*, No. 26-01259 (Ct. Int'l Trade Mar. 4, 2026) (order); *see also* Amended Order, *Atmus Filtration, Inc. v. United States*, No. 26-01259 (Ct. Int'l Trade Mar. 27, 2026) (extending the refund directive to finally liquidated entries).

**H. The Government Returns the Tariffs to Importers, Not Consumers**

51. Following the Supreme Court's decision, the CIT ordered CBP to refund the unlawfully collected IEEPA duties, with interest. CBP developed the CAPE system within its Automated Commercial Environment to process refunds at mass scale. CAPE began accepting refund declarations on April 20, 2026, and refunds began issuing shortly thereafter.

52. Under federal customs law and the CIT's orders, IEEPA refunds are payable only to the importer of record, the entity that remitted the duties to CBP, or its designee. Consumers who bore the tariffs' economic burden through pass-through pricing have no mechanism to obtain any portion of the refunds from the government.

53. The refund regime thus returns tariff monies to precisely the entities, like Levi, that have already recouped those monies from their customers.

**I. Levi Has Applied for an $80 Million Refund: "We Haven't Figured Out What to Do With It."**

54. Levi has told investors and the public, repeatedly and consistently, how much money is at stake. In its Form 10-Q filed April 7, 2026, Levi disclosed that it had paid approximately $80 million in IEEPA tariff charges through the first quarter of fiscal 2026.[28]

55. In April 2026, CFO Singh told CNBC that the Company expected to receive approximately $80 million in refunds for tariffs it paid on importing denim and other apparel from manufacturers around the world.[29]

56. Levi's next Form 10-Q, for the quarterly period ended May 31, 2026, repeated that "the Company estimates it has paid approximately $80 million under IEEPA tariffs," and explained the connection between the Supreme Court's ruling and Levi's own refund in the Company's own words:

> "On February 20, 2026 a U.S. Supreme Court ruling invalidated the tariffs imposed by the U.S. government under the International Emergency Economic Powers Act ('IEEPA') on products imported into the U.S., which introduced the potential for such previously collected tariffs to be refunded by the U.S. government. Through the

---

[28] Q1 2026 Form 10-Q, *supra* note 7, at 18.
[29] Mangan, *supra* note 8.

> first quarter of 2026, the Company paid approximately $80 million of these tariffs."[30]

57. The same filing acknowledged that the tariffs had materially increased the cost of Levi's U.S. inventory, the very cost Levi had told investors it was offsetting through its pricing actions: "[T]he cost of our inventory in the U.S. has generally increased and may increase further in the future. These increased costs could lead to a significant increase in cost of sales and a significant reduction in gross margin and income from operations."[31]

58. On Levi's second quarter fiscal 2026 earnings call, held July 8, 2026, after the refund process was already underway, an analyst asked Levi's management what the Company intended to do with the tariff refund. The answer was:

> "One is tariff refunds. Of $80 million, we've just started applying because most of our refunds go through the reconciliation process, there's a defined window a week or so ago. We haven't built that internally. We haven't incorporated into our internal results. We are not incorporating it in our guidance. It's substantial. We haven't figured out what to do with it, because that'll depend on the environment and a whole bunch of things."[32]

59. By its own admission, then, Levi has applied for the full $80 million refund, has confirmed that the amount is "substantial," and, months after the Supreme Court invalidated the tariffs and more than a year after Levi began collecting the corresponding price increases from consumers, has not committed to return any of it to the customers who paid it. Levi has instead made clear that the disposition of the refund will "depend on the environment," that is, on Levi's own business interests.

60. Levi has not refunded, credited, or otherwise returned to its customers any portion of the tariff-justified price increases collected during the Class Period. It has not committed to pass through any portion of the refunds to its customers. On information and belief, it has maintained the elevated prices after the tariffs were invalidated.

---

[30] Q2 2026 Form 10-Q, *supra* note 12.
[31] *Id.*
[32] Q2 Fiscal 2026 Earnings Call Tr., *supra* note 9.

61. As a direct result, Levi has been (and absent relief will continue to be) enriched twice over at its customers' expense: once by the tariff-justified overcharges collected from Plaintiff and the Class, and again by the government's refund, with interest, of the very duties those overcharges were represented to cover.

**J. Levi's Own Disclosures Frame the Consumer Overcharge**

62. Levi's own public statements establish the magnitude of the monies at issue. Levi has disclosed that it paid approximately $80 million in IEEPA duties, and it has applied for a refund of that amount, which CBP will pay with interest.

63. Levi told investors, repeatedly, that its tariff-driven pricing actions "partially offset" the tariffs' impact on its gross margin, and its third quarter fiscal 2025 gross margin exceeded analyst expectations by a full percentage point on the strength of targeted price increases. Every dollar of that offset was paid by Levi's customers. Those admissions, together with the approximately $80 million refund, the interest Levi will receive on it, and the declaratory and injunctive relief sought, place the amount in controversy well in excess of $5,000,000.

64. The precise amount Levi recouped from purchasers is a matter of proof, and Levi's own records, including its per-SKU pricing history, its customs entry data, and its internal margin analyses, will establish it.

65. Levi generates billions of dollars in annual net revenues. A substantial portion of that revenue was generated by United States consumer sales of products bearing the tariff-driven price increases.

**K. Equitable Relief Is Necessary to Prevent Levi from Retaining the Consumer-Funded Refund**

66. The IEEPA refund proceeds are a specific, identifiable, and traceable fund. They exist only because the tariffs were unlawful, and Levi recouped those tariffs, in substantial part, from Plaintiff and the Class before any refund was ever paid.

67. Levi has publicly confirmed that it has applied for the refunds, that the refunds are proceeding through CBP's reconciliation process, and that it has made no decision about their

disposition. On information and belief, Levi has received or will receive the refunds, with interest, in the coming months.

68. Absent the imposition of a constructive trust and an equitable lien that attach now, the refund proceeds will be commingled with Levi's general funds and deployed for whatever corporate purposes Levi's "environment" dictates, and the consumers who supplied those monies will recover nothing. Damages at law are inadequate to reach a fund that is presently in transit and subject to Levi's unilateral discretion.

69. Plaintiff is entitled to discovery into Levi's refund applications and receipts, its accounting treatment of the refunds, its internal deliberations regarding their disposition, and the extent to which its tariff-period price increases recouped the underlying duties.

## V. CLASS ACTION ALLEGATIONS

70. Plaintiff brings this action individually and on behalf of the following proposed classes pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3):

71. **The Nationwide Class:** All persons in the United States who, between February 4, 2025 and February 24, 2026 (the "Class Period"), purchased for personal, family, or household use a Levi Strauss & Co. product whose United States retail price was increased on or after February 4, 2025.

72. **The California Subclass:** All members of the Nationwide Class who made their purchase in California or while residing in California.

73. Excluded from the Classes are Defendant, its officers, directors, and employees; their parents, subsidiaries, and affiliates; any judicial officer assigned to this matter and his or her immediate family and staff; and persons who purchased for resale.

74. **Numerosity.** The Classes each comprise at least hundreds of thousands of purchasers, dispersed throughout California and the United States. Levi generates billions of dollars in annual net revenues, a substantial portion of which was generated by United States consumer sales of products bearing the tariff-driven price increases. Joinder of all members is impracticable.

75. **Commonality.** Common questions of law and fact predominate over questions affecting only individual members, including: (a) whether Levi raised United States retail prices in

response to the IEEPA tariffs; (b) the amount by which those increases exceeded prices that would otherwise have prevailed; (c) whether the IEEPA tariffs were unlawful (a question the Supreme Court has answered); (d) whether Levi has sought, received, or retained IEEPA refunds and their proceeds; (e) whether Levi's failure to disclose to consumers the tariff component of its prices and its intention to retain any refund was likely to deceive reasonable consumers; (f) whether Levi's retention of the pass-through overcharges and of the refund proceeds constitutes unfair or fraudulent business practices under the UCL and unjust enrichment under California law; and (g) the appropriate measure and form of class-wide restitution, including the propriety of a constructive trust.

76. **Typicality.** Plaintiff's claims are typical of the Classes: Plaintiff purchased a Levi product at a price bearing a tariff-driven increase and suffered the same injury from the same course of conduct as every other member.

77. **Adequacy.** Plaintiff has no interests antagonistic to the Classes and has retained counsel experienced in complex consumer class action litigation with the resources to prosecute this action vigorously.

78. **Rule 23(b)(3) Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The tariff component of any individual purchase is modest, typically several dollars to tens of dollars, making individual actions economically irrational, while Levi's aggregate retention is substantial. Class treatment presents no unusual manageability difficulties: the price increases were implemented at the SKU level, and Levi's own records identify its per-product pricing history and its direct customers.

79. **Rule 23(b)(2).** Levi has acted or refused to act on grounds that apply generally to the Classes, maintaining the tariff-justified prices, applying for and retaining the refunds, and refusing to establish any mechanism to return the tariff component or refund proceeds, such that final injunctive and corresponding declaratory relief is appropriate respecting the Classes as a whole.

## VI. CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**

**Unjust Enrichment / Restitution (Quasi-Contract)**

**(On Behalf of Plaintiff, the Nationwide Class, and the California Subclass)**

80. Plaintiff re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

81. Plaintiff and Class members conferred a benefit on Levi by paying retail prices that embedded the pass-through of the IEEPA tariffs. Levi received and retained that benefit. The tariffs have been declared unlawful, and the underlying duties are being refunded to Levi with interest. Levi's retention of both the consumer pass-through and the government refund is unjust. Levi would be made whole twice for a single unlawful exaction, at the sole expense of the consumers who funded it.

82. Under California law, a claim in quasi-contract for restitution lies to recover benefits unjustly retained. No enforceable contract term between Levi and its customers addresses the disposition of tariff refunds, and no adequate remedy at law exists for the reasons alleged above.

83. Plaintiff and the Classes are entitled to restitution and disgorgement of the tariff component of all Class Period purchases, and to the imposition of a constructive trust over all IEEPA refund proceeds received by or payable to Levi, including the interest paid thereon, to the extent of the amounts passed through to the Classes.

**SECOND CLAIM FOR RELIEF**

**Money Had and Received**

**(On Behalf of Plaintiff, the Nationwide Class, and the California Subclass)**

84. Plaintiff re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

85. Levi is indebted to Plaintiff and the Classes in a sum certain or capable of ascertainment, the tariff component of the prices paid during the Class Period, an amount ascertainable from Levi's own pricing, customs, and financial records, for money had and received by Levi for the use and benefit of Plaintiff and the Classes.

86. In equity and good conscience, Levi should not be permitted to retain those monies, which correspond to duties that were unlawfully exacted and that the government is returning to Levi with interest.

87. Levi has failed and refused to return any portion of those monies.

**THIRD CLAIM FOR RELIEF**

**Violation of the Unfair Competition Law**

**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

**(On Behalf of Plaintiff, the Nationwide Class, and the California Subclass)**

88. Plaintiff re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

89. Levi's conduct as alleged constitutes unfair and fraudulent business acts and practices within the meaning of Business and Professions Code section 17200.

90. **Unfair prong.** Levi's conduct is unfair under any of the tests applied in California courts. Levi (a) raised United States prices to pass through the cost of the IEEPA tariffs, as it described to investors as "tariff mitigation"; (b) did so on a "surgical," product-by-product basis without disclosure to consumers; (c) maintained those prices after the tariffs were held unlawful; and (d) applied for and is retaining the resulting refund for its own benefit, with no mechanism to return any portion to the customers who funded it.

91. The harm to consumers from this double recovery is substantial, is not outweighed by any countervailing benefit to consumers or competition and is not one consumers could reasonably have avoided. The increases were unannounced, the tariff component was not itemized, and consumers had no ability to know that the prices they paid embedded a government exaction that would later be refunded to Levi.

92. The conduct likewise offends the legislatively declared policies underlying California's consumer protection statutes and the customs refund regime, which exists to disgorge unlawful exactions, not to confer windfalls.

93. **Fraudulent prong.** Levi's course of conduct was likely to deceive reasonable consumers. While Levi told investors, analysts, and the financial press that it was raising prices to

offset the tariffs, it omitted from every consumer-facing communication that its increased prices embedded a purported tariff cost and that Levi would retain any subsequent refund of that cost for itself. Levi had exclusive knowledge of those facts, including which prices it raised, by how much, and why, and what it intended to do with any refund, and those facts were not reasonably accessible to consumers. The omitted facts were material: a reasonable consumer would consider it important that part of the price paid was a pass-through of a government exaction that Levi stood to recover a second time. Reasonable consumers were likely to believe, and did believe, that the prices they paid reflected a bona fide, lawful cost of the goods rather than a recoverable exaction Levi would reclaim for itself.

94. As a direct and proximate result, Plaintiff and Class members suffered injury in fact and lost money or property. Each paid more for Levi products than they would have paid absent the tariff-justified increases. Plaintiff and the Classes are entitled to restitution of the tariff component of the prices they paid, in an amount to be proven at trial, including by reference to Levi's own quantifications of its tariff costs and pricing actions.

95. Plaintiff and the Classes are further entitled to injunctive relief, including public injunctive relief, requiring Levi to (a) cease retaining IEEPA refund proceeds attributable to amounts passed through to consumers; (b) establish a mechanism to return such amounts; and (c) disclose to the consuming public the tariff component embedded in its Class Period prices. This request for public injunctive relief benefits the general public of California, not merely the parties.

96. Plaintiff lacks an adequate remedy at law with respect to the restitutionary and injunctive relief sought under this cause of action. The tariff refunds at issue are a specific, traceable fund flowing from CBP to Levi. Equitable remedies, including restitution, disgorgement, and a constructive trust or equitable lien over that fund and its traceable proceeds, can restore those specific monies to the consumers who supplied them. Damages at law would not reach Levi's ongoing and future receipt and retention of refund proceeds and would not prevent Levi from commingling and deploying those proceeds, as its management has said, according to "the environment and a whole bunch of things," before judgment.

**FOURTH CLAIM FOR RELIEF**

**Fraudulent Misrepresentation**

**Cal. Civ. Code §§ 1709, 1710**

**(On Behalf of Plaintiff, the Nationwide Class, and the California Subclass)**

97. Plaintiff re-alleges and incorporates by reference each preceding paragraph as though fully set forth herein.

98. Levi, through its CEO Gass, and its CFO Singh, publicly represented that its United States price increases were necessary to offset tariff costs that Levi was bearing and could no longer "absorb." Those statements were half-truths. Levi knew, but did not disclose, that once the IEEPA tariffs had been held unlawful and the duties were therefore subject to refund to Levi with interest, that Levi intended to keep any refund rather than return it to the customers who paid the price increases.

99. Levi had a duty to disclose these facts because it had exclusive knowledge of them, because it actively concealed them from consumers by raising prices "surgically" and without announcement, and because its partial representations were misleading without them. Cal. Civ. Code § 1710(3).

100. The omitted facts were material, and Levi concealed them intending that consumers would continue paying its increased prices. They did. Levi told investors it had "not seen an impact to demand." Plaintiff and Class members relied on Levi's omissions in paying those prices, and had the omitted facts been disclosed, they would have paid less or not purchased.

101. As a direct and proximate result, Plaintiff and Class members were damaged in an amount to be proven at trial, including the tariff component of the prices they paid. Because Levi's officers made, authorized, or ratified the misrepresentations and concealment with intent to deceive, Plaintiff and the Classes are also entitled to punitive damages under Civil Code section 3294.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Classes, respectfully requests that the Court enter judgment as follows:

1. Certifying the Nationwide Class and the California Subclass under Rule 23(a), (b)(2), and (b)(3), appointing Plaintiff as class representative, and appointing Cotchett, Pitre & McCarthy, LLP as class counsel;
2. Entering a declaratory judgment that Levi's retention of the tariff-justified price increases, and its receipt and retention of IEEPA tariff refund proceeds attributable to amounts passed through to consumers, constitute ill-gotten gains that must be returned to its customers;
3. Awarding restitution and disgorgement of all amounts by which Defendant was unjustly enriched, including the tariff component of all Class Period purchases;
4. Awarding compensatory and punitive damages on the Fourth Claim for Relief;
5. Imposing a constructive trust upon, and/or an equitable lien against, all IEEPA tariff refund proceeds (including interest) received by or payable to Defendant, and all traceable proceeds and substitutes therefor, to the extent of amounts passed through to the Classes;
6. Enjoining Defendant from transferring, distributing, or otherwise dissipating IEEPA tariff refund proceeds and their traceable substitutes, to the extent of the amounts passed through to the Classes, pending final judgment;
7. Granting public injunctive relief under the UCL as alleged herein;
8. Awarding pre-judgment and post-judgment interest at the maximum lawful rate;
9. Awarding attorneys' fees and costs, including under Code of Civil Procedure section 1021.5; and
10. Granting such other and further relief as the Court deems just and proper.

Date: October 20, 2026

**COTCHETT PITRE & MCCARTHY LLP**

By: */s/ Pierce H. Stanley*
JOSEPH W. COTCHETT
SARVENAZ J. FAHIMI
PIERCE H. STANLEY
VASTI S. MONTIEL

*Attorneys for Plaintiff and the Proposed Classes*

## VIII. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues so triable.

Date: October 20, 2026

**COTCHETT PITRE & MCCARTHY LLP**

By: */s/ Pierce H. Stanley*
JOSEPH W. COTCHETT
SARVENAZ J. FAHIMI
PIERCE H. STANLEY
VASTI S. MONTIEL

*Attorneys for Plaintiff and the Proposed Classes*